Thank you. Please be seated. First case of the afternoon is Henry Fairridge, HLB. And for the appellate, Mr. Ayers. And for the appellee, both Mr. Baber and Mr. Schmidt. Have you divided your time? Yes. Alright. You may proceed. Thank you, your honors. I'm Steve Ayers, on behalf of the appellate Bradley Entrican. May it please the court and counsel. Bradley Entrican is not the father of Hayden Ford. Legally speaking, he is at this point in time. Of course, his action pursuant to Section 7, subparagraph B-5 of the Parentage Act is an attempt to have that determination vacated. What we need to determine is, does he have that remedy available to him at this point in time. There are three major issues involved in this case. The first and primary being the issue of standing. Section 7, subparagraph B-5 of the Parentage Act requires that the father adjudicated be allowed to bring an action to determine the non-existence of a parent-child relationship if he falls under one of these four presumptions under Section 5. Those four presumptions are enumerated. The first two dealing with issues of marriage. The second two dealing with issues of acknowledgement of paternity. Specifically, the one we're looking at is the fourth one, where it requires that he and the mother both sign an acknowledgement of paternity. There are two major cases that deal with this issue of standing. The first being the case of Jackson v. Newsom, and that is an appellate court case where the facts are substantially similar. The second case is the Department v. Rommel-Smith, and that's an Illinois Supreme Court case from 2004, which deals with this type of issue in a different manner. These two cases can be reconciled within the plain meaning of the statute, and that's our position. First, on the Department v. Rommel-Smith, the facts of that case are that Mr. Smith signed a voluntary acknowledgement of paternity that has specific requirements and lists his specific rights and remedies on that voluntary acknowledgement. The court's primary concern in that case was whether or not he should be allowed to bring his action under Section 7, subparagraph B-5, based upon a presumption under Section 5A-3, the voluntary acknowledgement of paternity. And the primary concern there was if he was allowed to bring this action under 7B-5, it would run afoul of the requirements of Title IV-D of the Social Security Act. And the court at that point in time found that it was not. I found in Smith, they said, that allowing this cause of action to be brought by a man who becomes a father pursuant to a voluntary acknowledgement would directly contradict Section 6-D. So it seems like they drew a line between the first two presumptions, which were marital presumptions, and then the voluntary acknowledgement presumptions. They did. And the reasoning for that, Your Honor, was to not run afoul of Title IV-D of the Social Security Act. And there was some discussion about that, that it would not be the intent of the legislature to do that, and that there would be some reasoning for differentiating between the marital stat, the marital presumptions, and the acknowledgement presumptions, based upon the fact that in that case, Mr. Smith had signed a voluntary acknowledgement of paternity, was advised of his rights and remedies prior to signing that, and that has a very specific procedure for rescinding that. The reason for that very specific procedure is so that the statute does not run afoul of Title IV-D. And Smith also said, it makes no sense, on the other hand, to allow those men who sign voluntary acknowledgements to challenge the presumption of their paternity with DNA evidence. Does, is it your argument that there's presumption of paternity in this case under 5A-4? Yes, under 5A-4, there's an acknowledgement of paternity. It's really not in so much as an acknowledgement as voluntary. Smith says 7B-5 doesn't work when you have a presumption under 5A-3 or 4. Your Honor, I don't believe the Smith court recognized certain facts that are in this case, which would make this case also reconciled with Jackson v. Newsom. The court did, in dictum, go on to say that these are reasons which support our determination here. But what the court was primarily looking at was giving every word in the statute that's plain and ordinary meaning. And the biggest word that the court was looking at in Smith was the word adjudication. And the court wanted to give the word adjudication a meaning, and basically said that in voluntary acknowledgement cases, there is no adjudication. And therefore, the voluntary acknowledgement cases usually don't work, and that's why it should be the marital presumptions only. Now in that case, Mr. Smith made the argument that, well, if it was supposed to be the marital presumptions only, then the statute would have said only 5A-1 and 2, instead of just the presumptions under Section 5. And the Supreme Court said, well, no, because the statute also required an adjudication, and that's how they limited out these issues where you have a voluntary acknowledgement of paternity. And so that was some of the analysis in determining whether or not Mr. Smith would be allowed to bring his action after having signed a V.A.P. But the Supreme Court in Smith did not even acknowledge the case of Jackson v. Newsom. Sounds like Smith overrules Jackson v. Newsom. Your Honor, I would submit that if the court wanted to overrule the set of facts that are peculiar to Jackson v. Newsom, it would have discussed that and specifically done that. There are distinguishing factors between these cases which makes the Smith case not overrule Jackson v. Newsom. The cases are sufficiently different. In Jackson v. Newsom, there was not a signing of a V.A.P. What there was was an order that was signed by the mother and the father, where the father consented and said, yeah, probably dad, and the court in Jackson v. Newsom construed that order to be a voluntary acknowledgement, not running afoul of the requirements. Can you compare that to what happened here? Yes, yes. So I come in and I say I'll be bound by genetic testing, and if I fail to show up, I'll be defaulted. That's the equivalent of a voluntary acknowledgement of paternity. That's what we're submitting, Your Honor, is that Mr. Board... Explain that to me. Sure, yes. Mr. Enchikin was basically a brief summary of the early history of this case. Mr. Enchikin was given a notice that you are going to be declared the father of the child if you don't appeal. He submitted, well, hold on, hold on, I want to have genetic testing, and there's a one-page handwritten note, I want to have genetic testing. He comes in and discusses this with the department. He's lulled into believing that he is the father by the natural mother, Heather Board, and then goes ahead and signs the agreed order to be bound by genetic testing. Because he's lulled into believing that he is the dad, it's a half-hearted attempt, and it can be construed as an acknowledgement. Knowing that he was going to be adjudicated the father, he did not show up, so he consented to that and acknowledged his parenthood. How is he going to be adjudicated the father if the blood tests would show the opposite? At that point in time, he didn't believe the blood tests would show the opposite, Your Honor, and that's where we get to the issue of the statute of limitations. The fact that he didn't make any further effort to actually have that genetic testing because he was lulled into believing that he was, in fact, the father, shows that he did not have any actual knowledge of relevant facts to determine otherwise. But, Your Honors, it is our position that... Well, from 2001 forward, is that when he was lulled, or was it just around the time that he signed this, or he said he'd be banned by genetic testing? It was around the time he said he would be banned by genetic testing. Well, what about in 2001? That was in 2001, Your Honor. Oh, excuse me. Yes. And then when he came back in 2004 and said, you know, I do want to have this parentage action brought up again, I want to have genetic testing so I'll be relieved in not knowing. At that point in time, Heather Bord, the natural mother, was not willing to submit the DNA tests. So, moving to the issue of statute of limitations, the Department has argued, and the trial court actually said, well, at least as of 2004, we think he had sufficient reason to believe that maybe he's not dad, and therefore the two-year statute of limitations has run. But the actual pleading itself from 2004 that he filed was brought under the parentage act under 7B, not 7B-5, because he did not have a DNA test to bring the action under 7B-5. The action was brought under the parentage act asking for a DNA test to be submitted by the minor child. At that point in time, one of the allegations was that they had an agreement to have that done in 2004, and then the mother notified him that no, she wasn't going to bring the child for DNA testing, because I think the allegation was you can just tell by looking at him he's the dad. So from 2004 to 2011, the statute of limitations should be told, because there was no agreement to submit to DNA testing at that point in time when he may have had actual knowledge of relevant facts. In 2011, the DNA test was finally submitted to, or maybe it was 2010, and then once the DNA test came back, it showed that Mr. Enchikin was not the father of Hayden Bourne. Then he was able to bring his action finally under 7B-5. So the statute of limitations never runs until you have a DNA test? Not exactly, Your Honors. The statute of limitations would run when there is actual knowledge of relevant facts. Which you say is the DNA test. In this case, it either is the DNA test or it's something that occurred in 2004, but even if it occurred in 2004... He filed a lawsuit in 2004. He said, I question whether I'm the father. That's correct, and in filing that lawsuit, if we are to use that date that says, okay, he obviously had actual knowledge of relevant facts at this point in time, at that same point in time, the mother would not submit the DNA tests, and so the statute is told. Why? The case of Jackson... The question is his knowledge, not her actions. Except for the statute specifically says that the statute of limitations is told during the period that the mother is not willing to submit the DNA tests. So if the court is to construe that he must have had actual knowledge in 2004, at that point in time, the statute of limitations is told for the duration of the mother's non-agreement to submit the DNA test at that point in time. Of course, the mother was willing to submit in 2001, but at that point in time we're saying he was lulled into believing that he was the father, did not have actual knowledge of relevant facts. So that's the magic word, lulled. He benefits from the fact that he doesn't show up for his DNA test. Not exactly, because if he showed up for his DNA test, we wouldn't be here today, of course. But the fact that he didn't show up for his DNA test is a good indicator that at that point in time he really didn't have a reasonable belief that he wasn't the father. If he had a reasonable belief that he wasn't the father, a reasonable person would have showed up and had that determined that he was not the father and he wouldn't have paid child support for 10 years. What in the record shows lulling? I'm intrigued by that word. We submit that the record shows that based upon the fact that he had this sporadic reaction to the you're the dad notice from the department and then said no, no, I want genetic testing and then signed an agreed order to submit the genetic testing and then didn't show up. It was a half-hearted effort. So that shows that the mother of the child lulled him or the department lulled him into believing that he was the father? I would submit, Your Honor, that it does. How? What is in the record that shows us that? Just the fact that it was a half-hearted effort that he didn't follow through. So his failure to do what he was expected to do by the order shows that he had earlier been deceived into believing by some actions on the part of the mother that he was the father. That's what we would submit, Your Honor, and that's probably not necessarily in the record because there was no evidence on this issue. And we would also submit that... How do you get to argue it if there was no evidence? That's... I mean, this is a lot different than him saying I had an ongoing relationship with her but nothing to do with the child even though I was giving her some money sometimes and she always told me five different times over a course of four years that I was the dad. Well, Your Honor, I guess... I don't know if that's enough to lull if he was suspicious, but at least it would be something that you could point to. What I'm pointing to, Your Honor, though, is that half-hearted effort indicates that he did not have actual knowledge of relevant facts. As far as whether he was lulled or not, whether he really believed this or not, no evidence was presented on that because the trial court denied or dismissed this petition under 7b-5 and specifically said the statute of limitations is run. And your question is the same as mine. If there's no evidence, how can the trial court rule that way? We never got into evidence. We never had a hearing on, well, when did he have actual knowledge of relevant facts? The court looked at these three specific time points, 2001, 2004, and 2011, and said, well, these three specific time points, and based upon the record, we can determine that the statute of limitations has run. And if Your Honors have that question, I do as well, that where's the evidence that says it has run? Well, which was the half-hearted attempt? 2001. 2001. Well, what about the half-hearted attempt in 2004? 2004. That half-hearted also? It wasn't half-hearted. He filed an action under the Parentage Act. And he lost, and he didn't do anything about it. Well, he couldn't at that point in time. Why not? Because his only remedy would be to bring it under 7b-5. He can only bring a 7b-5 action if he has the DNA test in hand. And so that's why the statute of limitations is told to the extent that at that point in time, if he had actual knowledge of relevant facts, if she's not willing to submit to the DNA test. Well, he knows she's not willing to submit to a DNA test. He gets hit with an involuntary dismissal. Yes. He's appealing now. Why not appeal then? Then the involuntary dismissal was based upon re judicata because he brought it under 7b, not 7b-5. He wouldn't have standing at that point in time to bring it under 7b-5. You say he lost. Why didn't he refile the suit under the correct section? Because he did not have the requisite DNA test ahead of time to file that suit. And that is precisely why the statute of limitations is told during a period in which the mother will not submit to DNA testing. So he, at that point in time, was without remedy. And, Your Honors, I would submit that if the mother had not agreed to submit to DNA testing or submit the child to DNA testing, we still wouldn't be here because he would still be without remedy. That was a dumb mistake on her part to agree to DNA testing. Well, I guess it's in how you look at it. It's a mistake, but it's an opportunity for Mr. Antrikan and for this child to have justice in determining who the real father is. How does the statute speak to her earlier willingness to have DNA testing? And then later she says, no, I'm not accommodating it. It doesn't. So she's earlier been willing to. She is earlier been willing to. In 2001, when he said he wanted it, she said that's okay. That's correct. That is correct. But he doesn't even bother to show up. Right. And, Your Honors, I would submit, like before, that at that point in time, he did not have actual knowledge of relevant facts. He hadn't seen the child prior to the 2001 agreed order to be bound by genetic testing. He really hadn't developed any relationship with this child until 2010, 2011, when he finally saw the child and had the DNA test done. This isn't a guy who has visitation with this kid. Well, he didn't have any contact in 2004 either. But he challenged, he took the action to file, or he took action. Yes, he did. And sought to do something about this. Yes, and that's where we're left with the unknown. Was there something that happened in 2004 where he would have actual knowledge of relevant facts? We don't know. The fact that he did file the case is a good indicator, and that's what the trial court pointed to. It's a good indicator. Maybe he did have actual knowledge of relevant facts at that point in time because he filed his case. But at that point in time, there was no submission to DNA testing, and so he couldn't... But she had no obligation to submit to DNA testing. She didn't. But that's also why the statute's told. No. So even though the statute says the two-year period shall not apply to periods of time when the natural mother or the child refuses to submit to DNA tests, if she's already agreed to submit to DNA tests and the time has run, there is no obligation for her to submit to DNA tests, you say it doesn't make any difference that she doesn't have to do it. The statute is told during the time that she doesn't do it. That's correct, Your Honor, because there's three distinct points in time we're talking about. Number one, we're talking about 2001 when she said, sure, I'll submit to DNA tests. You know, I can understand your argument if she never agreed to submit to a DNA test. But the idea that she agreed to submit, he never shows up, and then years down the road he says, oh, statute of limitations didn't run because she didn't submit. The statute of limitations doesn't begin to run until he has actual knowledge of relevant facts. And then once he has that actual knowledge of relevant facts, then the statute of limitations begins to run and he has two years, except during the period within that time that she fails and does not agree to submit to DNA testing. I see my time's up. Thank you, Your Honor. We'll have additional time on rebuttal. Mr. Schmidt? Thank you, Your Honor. May it please the Court. John Schmidt on behalf of the Department of Health Care and Family Services. I want to draw the Court's attention to the fact that we've argued that there's no jurisdiction because the mother made an attorney fee claim under Section 17 of the Parentage Act,  so we believe that because that is still pending, not all claims have been resolved, and there is no Rule 304A language saying no just reason to delay enforcement or appeal from that order. But we've, I think, briefed that extensively. If there are no questions on that, I'll move on to the merits. I do have one question. Sure. And it's more of a philosophical question. Recognizing the statutory construct and the Department's rules construct, but at the end of the day, do you think it should be the policy of the State of Illinois that the determination of true fact parentage should be left open to question for the rest of these people's lives? Well, I think generally the answer to that is no. Nobody wants this. The State doesn't want this situation to exist, Your Honor. It's a terrible situation. It's not a good situation. But that's why the Act has provisions that give people who are alleged to be fathers the right to DNA testing. Section 11 of the Act confers that right on people who are in Mr. Entrecken's shoes, and not only are they given that right, they have to be admonished of that right by a court, or in this case by the administrative agency. He was not only admonished, he asked for the genetic testing. And I think as opposed to being lulled into believing he wasn't the father, once he was defaulted by the Department and the administrative proceedings, the record reveals on May 30th, 2001, he sent a letter to the Department protesting the default and saying, I want genetic testing. He got it. His request was granted. A genetic test was set for July, I believe it was July 17th. The mother and the child showed up, and he didn't. I think that's the policy of the state of Illinois. It's to try to get an accurate determination of who the parent is, but to do it expeditiously, so we don't have a situation like this, where everybody thinks that somebody's the father, and then when this child's nearly 13 years old, and all of a sudden something like this comes up, the Act is designed to avoid situations like that. And this easily could have been avoided if Mr. Entrecote just showed up, assuming that the paternity test he has is accurate. And we have to assume that at this point. We do have to assume that at this point. One other point that I would like to address, I think our position, of course, is that the Smith case holds that only the marital presumptions in Section 5, that only if the person's adjudicated as a father pursuant to one of those presumptions would the person have standing. Not if the person is considered the father due to a presumption resulting from a voluntary acknowledgement. And I would also point out Smith relied on language from Section 5B of the Act, saying that a presumption due to a voluntary acknowledgement is conclusive, as opposed to a presumption from a marital, from marriage, which may be rebutted by clear and convincing evidence. And when voluntary presumptions are done according to the proper procedures, the form, I believe the form on which somebody executes a voluntary presumption, again, advises the alleged father that they have the right to the DNA testing. But I think one other important point I'd like to make is even if Mr. Ayers was right, even if Smith, even if somebody who was considered the father pursuant to a voluntary presumption could file a Section 7B-5 action, this isn't a voluntary presumption. Under the Act, voluntary presumptions standing by themselves are conclusive on the issue of whether somebody is the father. We know that from Section B, which says that a voluntary acknowledgement creates a conclusive presumption. Section 6C says that a judicial proceeding to ratify a signed acknowledgement of paternity is neither required nor permitted. So a voluntary acknowledgement is something that, standing alone, makes the person legally the parent of the child. The agreement Mr. Antrikan signed to take the paternity test and be gotten by the test results, that agreement by itself does not make him the father. It only conditionally, he just conditionally agrees to be bound by the paternity result if I believe the paternity index on the test is greater than 500 to 1. And in exchange, everybody else agrees that he will not be considered the father if the test excludes him. So that's another reason why this can't even be considered a voluntary acknowledgement. So even under Jackson v. Newsom, which we believe was at least implicitly overruled by Smith, even under Jackson, he can't prevail here because this simply isn't a voluntary acknowledgement. Is 7B-5 the only way to raise the DNA test? I was thinking, you know, in criminal cases, somebody's convicted of a crime and 20 years later, oh, here's a DNA test that shows somebody else was a perpetrator. Well, the way that somebody would be allowed to challenge this is on grounds of, and that's under Section 6D in the Smith Court, Site Section 6D. If there were fraud, was fraud duress or mistake of fact, through a 214-01 petition. But first, there would need to be a showing that the acknowledgement, in effect, you're attacking the voluntariness of the acknowledgement, saying that it was based on fraud. So it wasn't truly voluntary. Then I would believe that if it was determined that the voluntary acknowledgement was the product of fraud, then the issue of paternity could be examined. And I believe at that time, DNA testing or other evidence might be appropriate. A court might even, Section 11 of the Act allows courts to order DNA testing, and that might be appropriate under those circumstances. But first, that initial hurdle would have to be met for gaining the relief from fraud, again, fraud duress or mistake of fact. And for those reasons, again, we submit that there's no jurisdiction here because the attorney fee claim has never been resolved. But if this court disagrees with that, we would ask for affirmance of the circuit court's dismissal order. Thank you. Thank you, Your Honor. May it please the court and counsel. I wanted to talk primarily about whether this was a voluntary acknowledgement, but I had a couple other minor issues I'd like to raise. I shouldn't say minor because I think they're all vital for the appellant, but a little easier discussed. One is on the agreement to be bound by genetic testing. There's specific waiver language in there, the right to contest the proceedings. Here we are 11 years later, and I think they're basically arguing that that paragraph does not apply. And I've yet to hear any argument where, under the Paternity Act, that it abrogates the language, the express waiver language in that, and I would submit that it doesn't. Changing the subject to the issue of statute of limitations, I will address this briefly in my brief, pardon the pun. I think the statute of limitations ran in 2002, and here's how I get to that. According to Mr. Entrecote's 2004 petition, he didn't think the child was his when it was born in 1999. The first he hears of it is five months after the child was born. Well, that ought to put him on notice there's an issue. These are relevant facts. The child was born September 15th, 1999. Five months later, it takes you to February 15th, 2000. I would submit that's when the statute of limitations began to run. Two years later, February 15th of 2002, he files his first petition to determine heritage in 2004. The statute had run two years even before he filed that, would be my position. What I'm especially concerned about, though, is this voluntary acknowledgment that Mr. Entrecote is claiming he made. Well, within the four corners of the document, there simply is no acknowledgment of paternity. It allows for three different outcomes. One is you're determined to be the father because the paternity index is greater than 500 to 1. Second one is you get defaulted, which is what happened. And the third is that he's actually determined not to be the father. So I find it hard to believe that a document that does not say it's an acknowledgment of paternity and expressly allows for other alternatives is somehow converted into an acknowledgment of paternity. Well, the only way they convert it into an acknowledgment of paternity is by some subsequent act off the record after he signed the request to be bound by, or the agreement to be bound by genetic testing. And I have grave problems with the appellants. So Smith doesn't apply to this case? Well, I think Smith does apply to this case because I believe that this... Well, if this isn't a presumption under... Well, the reason we're talking about the voluntary acknowledgment is because he's claiming that Mr. Interken was adjudicated to be the father to a presumption under Section 5 of the Act. Well, the only one that would fit here would be Section 5A.4. So what I've actually done is I just bypassed all that argument and got to the point of, gee, does 5A.4 apply here? Is this really a voluntary acknowledgment of paternity or a parentage? And I would submit not. But having said that, that was another point I was going to make is that, no, I think Smith applies. He's clearly missed the deadline to rescind it. Of course, we have another additional problem I didn't mention in my brief. Gee, when would the rescission date expire if it depends on another act after he's signed it to become a voluntary acknowledgment of paternity? And what is the act? Failure to appear for his second DNA test. So I think Smith does apply, but I was getting to a different part of the argument, actually. Is this really a voluntary thing or not? Well, my problem with the facts, and you keyed on that word lulled, is they're assuming a lot of things that there's actually no evidence for. If we're going to agree, and I don't agree, but if we were going to agree that an agreement to be bound by the results of genetic testing coupled with a default due to failure to appear amounts to an acknowledgment of paternity, I would ask you, okay, are we going to go on a subjective standard or an objective standard? Here's the subjective standard. I don't know. Well, I forgot. I was drunk that night. I had a flat tire. She lulled me into going. All these, what's well within Mr. Endrickon's head, what he knows, that nobody in here knows there is absolutely no record to back up any subjective basis that he voluntarily acknowledged paternity. If she told him that he was the dad and then they got married on that basis, he could challenge that under 7B, right? Yes, I think he could. Isn't this sort of what we have here? Sort of, but they didn't get married, so we're under a different statutory scheme. If she says, you're the dad, he's filed this petition, but he decides, well, if she says I'm the dad, I guess I am. I have no need to show up for genetic testing. I think statute affords husbands much greater protections than boyfriends. Part of the point of the legislature enacted this limited exception to the rule of res judicata is to, as was used in the legislative history, to avoid opening a Pandora's box. So what we have here is we have a guy that's been twice defaulted and appealed it, lost a suit, had his suit dismissed in 2004, and now he's coming in 2011 or 2012 and files another one. This guy somehow gets 4th or 5th or 6th bite at the apple, and I would say now that really is opening a Pandora's box. But if I could go back, I was talking about the subjective standard. I don't believe there's any evidence to back that up, that he subjectively intended this to be an acknowledgment of paternity. So I would ask, what would be the objective standard in this case? Well, I think this court should be very leery, as the legislature probably was, of making a ruling that anybody who gets defaulted is voluntarily acknowledged as paternity and then can come back in under 7b-5 and reopen the thing more than a decade later. I think that this is inviting chaos. You know, 7b-5 is amazing. It says you can have an adjudication of paternity, and years later you can have a DNA test and upset the adjudication. That's just something we shake our heads at. We've had a court proceeding, we've had an adjudication, and we just ignore that with the DNA test controls? Well, race judicata is a very important part of our judicial system. 7b-5 is a limited, I'm arguing very limited, the appellants are arguing hardly limited at all. And I think it should be limited very much. We're just inviting constant problems. And I did cite and then added an exhibit showing a long quote from the Cates case about the importance of the rule of race judicata, especially in paternity cases, and noting the terrible effects this can have on the child when the issue is raised later. And I think that when the court's considering the interplay of all these statutes, it should be looking at that, because I just think that Cates could hardly have said it better, and I would ask the court to look at the way these statutes interact in light of the opinions stated in Cates. Thank you. Thank you. Your Honor. Your Honor, with respect to the intent of the legislature, the cases of Smith and Jackson v. Newsom both cited the committee comments from the senator who proposed the bill. There was a specific instance which she was trying to correct, and she actually said, These are four cases where the man assumed he was the father, in the case of my constituent, and didn't question the fact that this might not be his child. In the case of her constituent, he was overseas, so he had no knowledge of the fact that his wife was running around. Now, because he didn't contest it or didn't bring up the question during the divorce or two years afterwards, he didn't find out until three years afterwards he stuck. And that's what they're trying to correct. And that's what's happened in this case as well. Mr. Entrichan came in, he assumed he was the father, because he had the knee-jerk reaction, Hold on, hold on, I don't know anything about this. He talks to his board. We would submit that if we were allowed to advance into a hearing, that this evidence would be there. Then he believed that, No, I guess I am the father, just as Your Honor pointed out, and believed that, and not until sometime later finds out that by a DNA test, Oh, I'm not the father. Right now, he's stuck. He hasn't developed a relationship with his child. He's been paying child support for ten years for this child, or over ten years, and it's not his child. The reason 7b-5 was enacted was an opportunity for our judicial system to get it right. The DNA test shows by scientific evidence this is not his child, but legally it still is, unless there's some methodology, some remedy for him to use to get it right. That's why we believe that 7b-5 should allow Mr. Endricon that remedy, based upon his facts. We would submit that the facts in this case are more similar to those in the Jackson v. Newsom case. There's been some argument about whether or not his signing this agreement to be bound by the genetic testing, coupled by his failure to appear for the genetic testing should constitute an acknowledgement or not in the Jackson v. Newsom case. The court there held that there was not this specific provision under 12b-5, and that the provisions of 7b-5 were not intended to have all of those minute details followed. What we're looking at is the purpose, and the purpose there was that he was adjudicated to be the father based upon some piece of evidence which was not a scientific test. Now he has had that scientific test. He's not the father. We know that. Now he needs to have the remedy afforded to him. You're right that Jackson v. Newsom distinguished between mere presumptions of paternity and presumptions based on a paternity test, a DNA test. But your guy, again, he had all that available to him. He did, and that's the crux of the matter here. If he had gone through and I've had this discussion with him, why didn't you just go through with it? And, well, I thought the kid was mine. She told me it was mine. I didn't have any reason not to believe it. And that's what we would submit. Shouldn't there be some finality to all this? There should be, Your Honor, except in the cases where we just need to get it right. It's the exact same issue. So you're saying, no, there shouldn't be any finality. Let the kid wait until the kid is 13 years old, and then we'll decide that the dad is not the dad. Well, if he did not have any actual knowledge, relative facts, any reason to believe he wasn't the father and didn't bring it up until then, and then now we find out, yeah, he is, I would submit that it's better to get it right late than to keep it wrong forever. Thank you. Thank you. We take this matter under advisement and stand in recess until the body is in the next case.